**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1455**

---

STOP RECKLESS ECONOMIC INSTABILITY CAUSED BY DEMOCRATS,
("Stop Reid"); TEA PARTY LEADERSHIP FUND; ALEXANDRIA
REPUBLICAN CITY COMMITTEE,

> Plaintiffs - Appellants,

AMERICAN FUTURE PAC,

> Intervenor/Plaintiff – Appellant,

> and

NIGER INNIS; NIGER INNIS FOR CONGRESS,

> Plaintiffs,

> v.

FEDERAL ELECTION COMMISSION,

> Defendant - Appellee.

---

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.    Anthony J. Trenga,
District Judge.  (1:14-cv-00397-AJT-IDD)

---

Argued:  December 8, 2015        Decided:  February 23, 2016

---

Before TRAXLER, Chief Judge, SHEDD, Circuit Judge, and Elizabeth
K. DILLON, United States District Judge for the Western District
of Virginia, sitting by designation.

---

Affirmed in part; vacated and remanded in part with instructions by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Shedd and Judge Dillon joined.

———————————

**ARGUED:** Michael T. Morley, COOLIDGE-REAGAN FOUNDATION, Washington, D.C., for Appellants. Kevin Paul Hancock, FEDERAL ELECTION COMMISSION, Washington, D.C., for Appellee. **ON BRIEF:** Dan Backer, DB CAPITOL STRATEGIES, Alexandria, Virginia, for Appellants Stop Reckless Economic Instability Caused by Democrats, Tea Party Leadership Fund, and Alexandria Republican City Committee; Jerad Najvar, NAJVAR LAW FIRM, Houston, Texas, for Intervenor-Appellant American Future PAC. Lisa J. Stevenson, Deputy General Counsel-Law, Kevin Deeley, Acting Associate General Counsel, Harry J. Summers, Assistant General Counsel, FEDERAL ELECTION COMMISSION, Washington, D.C., for Appellee.

———————————

TRAXLER, Chief Judge:

Four political committees – "Stop Reckless Economic Instability Caused By Democrats" ("Stop PAC"), "Tea Party Leadership Fund" ("the Fund"), "Alexandria Republican City Committee" ("ARCC"), and "American Future PAC" ("American Future") (collectively, "Appellants") – appeal a district court order granting summary judgment against them in their claims challenging the constitutionality of certain contribution limits established by the Federal Election Campaign Act of 1971 ("FECA"), see 52 U.S.C. §§ 30101–30146. We conclude that two of the three claims became moot before the district court granted summary judgment, and we therefore vacate the merits judgment on those counts and remand to the district court with instructions to dismiss them for lack of subject-matter jurisdiction. Regarding the third claim, we affirm.

I.

FECA regulates many different types of donors and recipients. See 52 U.S.C. §§ 30116, 30118-19, 30121 (formerly 2 U.S.C. §§ 441a, 441b-441c, 441e). To understand the issues before us in this appeal, it is necessary to understand some of FECA's basic concepts and limits.

To begin, FECA defines a "political committee" as "any committee, club, association, or other group of persons" that, during a calendar year, received contributions or made

3

expenditures in excess of $1,000. 52 U.S.C. § 30101(4)(A) (formerly 2 U.S.C. § 431(4)(A)); see The Real Truth About Abortion, Inc. v. FEC, 681 F.3d 544, 555 (4th Cir. 2012). FECA defines "expenditures" and "contributions" as encompassing spending or fundraising "for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i), (9)(A)(i) (formerly 2 U.S.C. § 431(8)(A)(i), (9)(A)(i)); see also Buckley v. Valeo, 424 U.S. 1, 79 (1976) (limiting FECA's political-committee requirements to organizations that are controlled by a candidate or whose "major purpose" is to nominate or elect a candidate); The Real Truth About Abortion, Inc., 681 F.3d at 555. A group that has met the political-committee criteria must register with the Federal Election Commission ("FEC"). See 52 U.S.C. § 30103(a) (formerly 2 U.S.C. § 433(a)).

There are different types of political committees. Some are associated with a particular candidate or entity. See, e.g., 52 U.S.C. § 30101(14) (providing that a "national committee" is a political committee responsible for the day-to-day operation of a national political party); 52 U.S.C. § 30101(15) (providing that a "State committee" is a political committee that is responsible for the day-to-day operation of a political party at the state level); 52 U.S.C. § 30102(e)(1) (providing that each candidate must designate a political

4

committee to serve as the candidate's "principal campaign committee"). And others are not associated with any candidate or entity ("non-connected political committees").

FECA sets different contribution limits for different classes of donors and recipients. A contribution made by a non-connected political committee to an individual candidate is governed by the restriction limiting contributions by "persons" generally. 52 U.S.C. § 30116(a)(1)(A). "Persons" include "individual[s], partnership[s], committee[s], association[s], corporation[s], labor organization[s], or any other organization[s] or group[s]" other than the federal government. 52 U.S.C. § 30101(11). In 2014, the inflation-adjusted limit for contributions by "persons" was $2,600 per election, with primaries and general elections counting as separate elections.[1] However, non-connected political committees, unlike other types of persons, qualified for an elevated per-election limit of $5,000 on contributions to individual candidates if and when

---

[1] 52 U.S.C. § 30116(a)(1)(A) sets the per-election limit at $2,000. However, that amount had been adjusted for inflation to $2,600 by the time the parties filed their memoranda in the district court regarding summary judgment, see Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 78 Fed. Reg. 8,530-02, 8,532 (Feb. 6, 2013), and it was adjusted on February 3, 2015, to $2,700, see Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 80 Fed. Reg. 5,750-02, 5,752 (Feb. 3, 2015). See also 52 U.S.C. § 30116(c) (providing for periodic inflation adjustment of certain limits).

they satisfied three criteria: They must have "been registered [with the FEC] for a period of not less than 6 months" (the "waiting period"), "received contributions from more than 50 persons," and "made contributions to 5 or more candidates for Federal office." 52 U.S.C. § 30116(a)(4); see 52 U.S.C. § 30116(a)(2)(A). A political committee satisfying these criteria is referred to as a "multicandidate political committee" ("MPC"). Id.

FECA also limits contributions that persons and political committees can make to political party committees. See 52 U.S.C. § 30116(a)(1)(B), (D), (a)(2)(B)-(C). With regard to contributions to these committees, the limits decrease when the non-connected political committee becomes an MPC. When this case was commenced in April 2014, persons (including non-connected political committees that did not qualify as MPCs) could contribute $32,400 per year to national party committees and $10,000 combined to state political party committees and their local affiliates, while the corresponding limits for MPCs were $15,000 and $5,000. See id.; 11 C.F.R. § 110.3(a)(1); Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 78 Fed. Reg. 8,530-02, 8,532 (Feb. 6, 2013).

On December 16, 2014, Congress amended FECA to create a new category of limits. Under the amended law, national party

6

committees can create up to three segregated accounts to fund their presidential nominating convention, building headquarters, and election-related legal expenses. See Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, Div. N, § 101, 128 Stat. 2130, 2772-73 (Dec. 16, 2014) (codified as amended at 52 U.S.C. § 30116(a)(1)(B), (a)(2)(B), (a)(9)). The annual limits for contributions made to such segregated accounts are three times the limits on other contributions to national party committees. See id.

## II.

The plaintiffs in this suit, Stop PAC, the Fund, and ARCC, filed their initial complaint against the FEC on April 14, 2014, and filed an amended complaint on July 7, 2014 (the "Amended Complaint"). The Amended Complaint alleged the following facts regarding the parties.

Plaintiff Stop PAC is a non-connected political committee that registered with the FEC on March 11, 2014. As of April 14, 2014, Stop PAC had over 150 contributors and had made contributions to five candidates for federal office. On or around April 4, 2014, Stop PAC contributed the maximum $2,600 to candidate Niger Innis in the Nevada Primary for the Republican

7

nomination for a seat in the U.S. House of Representatives.[2] On or around June 16, 2014, Stop PAC contributed the same amount to candidate Dan Sullivan in the Alaska Primary for the Republican nomination for the U.S. Senate. Stop PAC wished to contribute more to each candidate — as it could have had it been an MPC — but its waiting period would not expire until September 11, 2014, after the primaries were held.

Stop PAC also contributed $2,600 to Congressman Joe Heck, Republican nominee for Congress from Nevada's 3rd Congressional District, in connection with his 2014 general election. Stop PAC wished to contribute more to Heck immediately, but it was prohibited from doing so until its waiting period expired.

The Fund is a non-connected MPC that registered with the FEC in 2012, has over 100,000 contributors, and has contributed to dozens of federal candidates. Because the Fund was an MPC, the maximum amounts it could contribute annually to a state political party committee and its local affiliates and to a national party committee each year were $5,000 and $15,000, respectively. See 52 U.S.C. § 30116(a)(2)(B)-(C); 11 C.F.R. § 110.3(a)(1).

---

[2] Innis and his campaign committee were plaintiffs in the original complaint, but the district court granted a motion to voluntarily dismiss them.

Plaintiff ARCC is a local political party committee affiliated with the Virginia Republican State Committee, which is a state political party committee. The Fund contributed the statutory maximum of $5,000 to ARCC on April 4, 2014. For the year 2014, the Fund wished to contribute an additional $5,000 to ARCC and $32,400 to the National Republican Senatorial Committee ("NRSC"), both of which FECA would have allowed had the Fund not yet become an MPC. See 52 U.S.C. § 30116(a)(1)(B), (D), (a)(2)(B)-(C); see 78 Fed. Reg. at 8,532.

The Amended Complaint contains three claims, each of which seeks declaratory and injunctive relief. Counts I and II pertain to FECA's $2,600-per-election limit on contributions made to individual candidates by political committees that have not yet become MPCs. See 52 U.S.C. § 30116(a)(1)(A). In Count I, Stop PAC alleges that that limit, as applied to Stop PAC, violates the equal protection component of the Fifth Amendment's Due Process Clause because FECA applies a higher limit to MPCs than it does to political committees that have not completed the waiting period but have satisfied the other MPC criteria. In Count II, Stop PAC alleges that the waiting period, as applied to Stop PAC, violates its First Amendment rights to free speech and free association. In Count III, ARCC and the Fund allege that FECA's annual limits on contributions made by MPCs to national party committees ($15,000), see 52 U.S.C.

§ 30116(a)(2)(B), and to state party committees ($5,000), see 52 U.S.C. § 30116(a)(2)(C), violate the equal protection component of the Fifth Amendment's Due Process Clause insofar as political committees that have not yet completed the waiting period but that have satisfied the other MPC criteria enjoy the higher limits of $32,400 and $10,000, respectively.

On August 27, 2014, the plaintiffs moved to join American Future in the suit as an intervening plaintiff concerning Counts I and II. American Future is a non-connected political committee that registered with the FEC on August 11, 2014. As of August 22, 2014, American Future had raised $5,473 from 54 contributors. It contributed $2,600 to candidate Tom Cotton's general election campaign in Arkansas for the U.S. Senate, and $100 each to four other candidates. American Future wished to contribute $2,000 more to Cotton for the 2014 general election, but FECA prevented it from doing so since American Future's waiting period was not due to expire before the November 2014 election. American Future also wished to contribute more than $2,600 to Cotton immediately but could not do so until he filed paperwork concerning the 2016 primary election. Finally, American Future desired to contribute more than $2,600 as soon as possible to other candidates for their 2016 primaries. On October 6, 2014, the district court entered an order allowing

10

American Future to intervene pursuant to Federal Rule 24. See Fed. R. Civ. P. 24.

On September 19, 2014, before the district court ruled on the plaintiffs' joinder motion, the parties filed cross-motions for summary judgment. In support of its motion, the FEC, in addition to arguing that none of the challenged limitations were unconstitutional, asserted that the district court lacked subject-matter jurisdiction over Stop PAC's claims (Counts I and II). In particular, it argued that Stop PAC's claims should be dismissed for lack of standing since it caused its own injury by not registering as early as November 2013, in time to become an MPC before the three elections concerning which it wished to make additional contributions. The FEC also argued that Stop PAC's claims were moot because it became an MPC on September 11, 2014, and was thus no longer subject to the limit that it challenged, and never would be again.

In response, the plaintiffs contended that Stop PAC established standing. In that regard, they objected to the FEC's attempt to "effectively blame Stop PAC for failing to organize itself more than six months before the primaries," when in fact "[m]ost ordinary people are not especially interested in becoming involved in the political process until shortly before an election." Memo. in Opp'n to FEC's Mot. for Summ. J. 3. As for the FEC's suggestion that Stop PAC's claims were moot, the

11

plaintiffs invoked the exception for claims that are "capable of repetition, yet evading review."  Southern Pac. Term. Co. v. ICC, 219 U.S. 498, 515 (1911).  Although the plaintiffs acknowledged that this exception is generally applied only when the plaintiff itself faces a risk that it will be subject to the same challenged provisions in the future, the plaintiffs argued that the same-plaintiff requirement need not be met in election-related cases.

On February 24, 2015, as the parties waited for the district court to rule on their summary judgment motions, the FEC filed a notice with the district court raising additional arguments regarding mootness.  In the notice, the FEC informed the district court that on February 11, 2015, American Future had become an MPC.  As it had argued regarding Stop PAC, the FEC contended that American Future, as an MPC, was no longer affected by the limit it was challenging and never would be again.  The FEC's filing also informed the court of the December 16, 2014 change in the law allowing contributions to the specified segregated accounts of national parties of three times the limits on other contributions to national party committees. The FEC maintained that that change mooted the Fund's challenge to the limits on an MPC's contributions to national party committees.

12

The district court subsequently granted summary judgment to the FEC on all claims. See Stop Reckless Econ. Instability Caused By Democrats v. FEC, 93 F. Supp. 3d 466 (E.D. Va. 2015) ("Stop"). Regarding each of the three claims, the district court assumed that the FEC's arguments regarding standing and mootness failed, see id. at 472-73, and ruled that the FEC was entitled to summary judgment on the merits, see id. at 473-77. As for Count II, alleging a First Amendment violation, the district court concluded that "Stop PAC and American Future cannot show that they have suffered a cognizable constitutional injury as a result of the waiting period, even if they would have made a higher contribution, had they been permitted to do so." Id. at 474 (citing Buckley v. Valeo, 424 U.S. 1 (1976), and California Med. Ass'n v. FEC, 453 U.S. 182 (1981)). Regarding Counts I and III, alleging violation of the plaintiffs' equal protection rights under the Fifth Amendment, the district court concluded that Stop PAC and the Fund were not similarly situated to each other, and thus that "FECA does not improperly discriminate among such committees" and "does not violate the plaintiffs' rights under the Fifth Amendment." Id. at 477. The district court alternatively ruled that any discrimination was justified under either rational-basis or intermediate scrutiny. See id.

13

III.

With regard to each of the three counts, Appellants argue that the district court erred in granting summary judgment against them. In response, the FEC maintains that the district court should never have addressed the merits of the claims because it lacked subject-matter jurisdiction over them. See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Alternatively, the FEC argues that the district court's decision regarding the merits was correct.

"Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. 506, 514 (1868). Accordingly, the Supreme Court has stated in no uncertain terms that federal courts are not free to simply assume that they possess subject-matter jurisdiction and then proceed to decide the merits of the issues before them when their jurisdiction remains in doubt. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998). Rather, federal courts must determine whether they have subject-matter jurisdiction over a claim before proceeding to address its merits. See id. The district court erred in failing to follow this course in this case.

14

We therefore begin our analysis by addressing the FEC's contentions that the district court did not have subject-matter jurisdiction when it granted summary judgment to the FEC.

Article III gives federal courts jurisdiction only over "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2, cl. 1. "One essential aspect of this requirement is that any person invoking the power of a federal court must demonstrate standing to do so," which "requires the litigant to prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013).

"To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) (internal quotation marks omitted). Accordingly, a case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Chafin v. Chafin, 133 S. Ct. 1017, 1023 (2013) (some internal quotation marks omitted).

A case that would otherwise be moot is not so if the underlying dispute is "capable of repetition, yet evading

15

review." Southern Pac. Term. Co., 219 U.S. at 515. The Supreme

Court has explained

> that in the absence of a class action, the "capable of
> repetition, yet evading review" doctrine was limited
> to the situation where two elements combined: (1) the
> challenged action was in its duration too short to be
> fully litigated prior to its cessation or expiration,
> and (2) there was a reasonable expectation that the
> same complaining party would be subjected to the same
> action again.

Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam);

see id. (holding that doctrine did not prevent the case from

being moot because the "case, not a class action, clearly does

not satisfy the latter element").

### A.

Regarding Counts I and II, the FEC repeats its argument

presented below that Stop PAC lacked standing to prosecute

Counts I and II. The FEC also repeats its alternative

contention that Counts I and II became moot once Stop PAC and

Intervenor American Future became MPCs, since that change in

status ensured that they would never again be bound by the limit

they are challenging. We agree with this latter argument. See

United States v. Juvenile Male, 131 S. Ct. 2860, 2865 (2011)

(per curiam) (holding that exception's same-complaining-party

requirement was not met when plaintiff challenging special

conditions of juvenile supervision had turned 21 and thus would

"never again be subject to an order imposing [such] special

16

conditions"). Because we conclude that Counts I and II became moot before the district court granted summary judgment, we do not address the FEC's contention that Stop PAC never established standing to assert these claims in the first place. See Arizonans for Official English, 520 U.S. at 66-67 (declining to decide standing issue when claim was moot).

Appellants do not deny that once Stop PAC and American Future became MPCs and the contribution limit they are challenging therefore ceased to apply to them, the district court was no longer in position to prevent any threatened injury (or provide redress for any past injury). Nevertheless, Appellants argue that the "capable of repetition, yet evading review" doctrine applied to prevent Counts I and II from becoming moot. In this regard, Appellants do not dispute the fact that there was no longer any reasonable expectation that they would be subject to the same limit again. Rather, they maintain that in election-related cases, the same-complaining-party element need not be satisfied. We disagree.

In support of their argument, Appellants rely primarily on Justice Scalia's dissent in Honig v. Doe, 484 U.S. 305, 335-36 (1988) (Scalia, J., dissenting). In the dissent, Justice Scalia cited abortion and election cases in which he argued the Court had "dispens[ed] with the same-party requirement" and "focus[ed] instead upon the great likelihood that the issue will

17

recur <u>between the defendant and the other members of the public at large</u>." <u>Id.</u> (emphasis in original).[3]

Since <u>Honig</u> was decided, courts have taken different views regarding whether the cases cited in Justice Scalia's dissent indicated a deliberate decision by the Supreme Court not to apply the same-complaining-party requirement in election cases. Partially as a result of this disagreement, courts have reached different results when considering arguments like the ones Appellants now raise. <u>Compare</u> <u>Van Wie v. Pataki</u>, 267 F.3d 109, 114-15 (2d Cir. 2001) (applying same-plaintiff requirement in an election case), <u>and</u> <u>Barilla v. Ervin</u>, 886 F.2d 1514, 1519-20 & n.3 (9th Cir. 1989) (same), <u>with</u> <u>Catholic Leadership Coal. of Tex. v. Reisman</u>, 764 F.3d 409, 423-24 (5th Cir. 2014) (concluding that same-plaintiff requirement need not be met in election cases), <u>Lawrence v. Blackwell</u>, 430 F.3d 368, 372 (6th

---

[3] Justice Scalia acknowledged that those cases may "have been limited to their facts, or to the narrow areas of abortion and election rights, by [the Court's] more recent insistence that, at least in the absence of a class action, the 'capable of repetition' doctrine applies only where 'there [is] a "reasonable expectation"' that the '<u>same complaining party</u>' would be subjected to the same action again." <u>Honig v. Doe</u>, 484 U.S. 305, 336 (1988) (Scalia, J., dissenting) (emphasis in original). In class actions, at least when the class is certified while the case remains live for the named plaintiff, a reasonable expectation that someone in the represented class will be subject to the same action may be sufficient to satisfy the "capable of repetition" prong of the exception. <u>See</u> <u>Genesis Healthcare Corp. v. Symczyk</u>, 133 S. Ct. 1523, 1530-31 (2013); <u>Sosna v. Iowa</u>, 419 U.S. 393, 401-02 (1975).

Cir. 2005) (same), and Majors v. Abell, 317 F.3d 719, 723 (7th Cir. 2003) (same).

In the end, we need not decide whether we believe the Supreme Court has sub silentio limited, or created an exception to, the requirements of the "capable of repetition, yet evading review" doctrine. That is so because even were we to conclude that the Supreme Court has actually sub silentio excused compliance with the rule in some election cases, we would be obligated to follow the rule that the Court has actually articulated. See, e.g., Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority sub silentio."); Hohn v. United States, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); Agostini v. Felton, 521 U.S. 203, 237 (1997) (explaining that if a Supreme Court precedent directly controls, "yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions" (internal quotation marks omitted)); id. (explaining that lower courts should not conclude that the Supreme Court's "more recent cases have, by implication, overruled [its] earlier

19

precedent"); <u>Mackall v. Angelone</u>, 131 F.3d 442, 445–49 (4th Cir. 1997) (en banc) (applying <u>Agostini</u> and refusing to create an exception to a general rule articulated by the Supreme Court even though a subsequent Supreme Court case had noted that in a future case the Court might adopt the exception we were considering).

Moreover, the Supreme Court has actually applied the same-complaining-plaintiff rule in two relatively recent election cases. <u>FEC v. Wisconsin Right To Life, Inc.</u>, 551 U.S. 449 (2007), concerned an as-applied challenge to a federal prohibition on the use of corporate funds to finance "electioneering communications" during a 60-day pre-election black-out period. <u>See</u> <u>id.</u> at 457-60. With the black-out period long over, the Supreme Court considered whether the case met the requirements of the "capable of repetition, yet evading review" doctrine. The Court explained that "[t]he second prong . . . requires a 'reasonable expectation' or a 'demonstrated probability' that 'the same controversy will recur <u>involving the same complaining party</u>.'" <u>Id.</u> at 463 (emphasis added). The Court concluded that the requirement was met in that case because the plaintiff "credibly claimed that it planned on running materially similar future targeted broadcast ads mentioning a candidate within the blackout period, and there is no reason to believe that the FEC will refrain from prosecuting

20

violations of" the challenged statute. Id. (citation and internal quotation marks omitted).

In Davis v. FEC, 554 U.S. 724 (2008), the Supreme Court reviewed a challenge from a self-financed candidate to certain campaign-finance-disclosure requirements to which he was subject. See id. at 731-32. With the litigation having continued after the election occurred, the Court again considered whether the "capable of repetition, yet evading review" doctrine applied. The Court again applied the same-complaining-party requirement, and determined it was satisfied because the candidate had publicly announced that he intended to run again as a self-financed candidate. See id. at 735-36.

Like the Supreme Court, we have also applied the same-complaining-plaintiff requirement in recent election cases. Most recently, in Lux v. Judd, 651 F.3d 396 (4th Cir. 2011), we reviewed a constitutional challenge to a state's requirement that each signature on a petition for ballot placement by an independent candidate for Congress be witnessed by a district resident. See id. at 398. In considering whether the case satisfied the requirements of the "capable of repetition, yet evading review" doctrine, we noted that "[e]lection-related disputes qualify as 'capable of repetition' when 'there is a reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election

21

cycles.'"  Id. at 401.  We concluded that that requirement was satisfied in that case.  See id.

For all of these reasons, we conclude that we are bound to apply the doctrine that we and the Supreme Court have articulated — and recently applied — and we must leave to the Supreme Court the decision of whether it wishes to create an exception to, or otherwise limit, that rule.  Accordingly, because Appellants cannot satisfy the same-complaining-party requirement, the "capable of repetition, yet evading review" doctrine does not apply, and the district court erred in not dismissing Counts I and II for lack of subject-matter jurisdiction.  We therefore vacate the district court's merits ruling regarding the claims and remand them to the district court for dismissal in accordance with Rule 12(h)(3).

B.

The FEC contends that the district court erred in declining to dismiss Count III on mootness grounds as well.  We disagree.

In Count III the Fund and ARCC challenge the constitutionality of the annual $5,000 limit that applies to contributions from MPCs to state political party committees and their local affiliates, and the Fund challenges the constitutionality of the annual $15,000 limit on contributions from MPCs to national party committees.  See 52 U.S.C.

22

§ 30116(a)(2)(B)-(C). The FEC advances distinct mootness arguments concerning each of these two challenges.

Regarding the challenge to the limit on contributions to state party committees and their local affiliates, the FEC notes that the Amended Complaint alleges that the Fund wished to "immediately contribute an additional $5,000 to . . . ARCC, which would bring its total contributions to . . . ARCC for the year 2014 to $10,000." J.A. 59. The FEC argues that, once 2014 ended, this challenge was moot because the district court could not grant the Fund the right to contribute additional amounts to ARCC in 2014.

We conclude, however, that this challenge, unlike those presented in Counts I and II, easily fits into the "capable of repetition, yet evading review" exception. It is undisputed that the election cycle is too short in duration for election disputes to be fully litigated within a single cycle. See Moore v. Ogilvie, 394 U.S. 814, 816 (1969). And the Fund very well may wish to contribute more than $5,000 to the ARCC in future years. To invoke the exception, Appellants are not required to forecast evidence that they were so inclined. See North Carolina Right to Life Comm. Fund for Indep. Political Expenditures v. Leake, 524 F.3d 427, 435 (4th Cir. 2008) (holding that constitutional challenges to system of public financing for judicial elections, brought by two political

23

committees and a candidate, were not mooted by the election even though neither the political committees nor the candidate had specifically alleged an intent to participate in future election cycles; concluding that "there is a reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election cycles"; rejecting "the argument that an ex-candidate's claims may be 'capable of repetition yet evading review' only if the ex-candidate specifically alleges an intent to run again in a future election"); see also Honig, 484 U.S. at 318-19 n.6 ("Our concern in these cases, as in all others involving potentially moot claims, was whether the controversy was capable of repetition and not . . . whether the claimant had demonstrated that a recurrence of the dispute was more probable than not." (emphasis in original)).

As for the Fund's challenge to the annual $15,000 limit on contributions from MPCs to national party committees, the FEC contends that that challenge was mooted by the December 2014 change in the law referenced earlier. The Fund had alleged in its 2014 Amended Complaint that it wanted to "immediately contribute $32,400 to the" NRSC. J.A. 59. The December 2014 amendment authorized the NRSC to create a segregated account to fund their building-headquarters expenses and another to fund

24

their election-related legal expenses.[4]  See Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, Div. N, § 101, 128 Stat. 2130, 2772-73 (Dec. 16, 2014) (codified as amended at 52 U.S.C. § 30116(a)(1)(B), (a)(2)(B), (a)(9)). Under the new law, donors may make contributions to each of these new accounts in amounts up to three times the amounts they could previously contribute to a national party committee.  See id.  In this way, if the NRSC created such segregated accounts, the Fund would have been free to contribute $32,400 to the building-fund account or legal-fund account were it so inclined. We conclude, however, that the possible availability of this new option did not moot the challenge here.  Nothing in the record indicates that the Fund had or has any interest in donating to such specialized accounts.  Because the $15,000 limit that the Fund is challenging remains in place, we conclude that this challenge, like the challenge to the $5,000 annual limit on MPC contributions to state and local political committees, fits into the "capable of repetition, yet evading review" exception.

IV.

Having determined that the district court possessed subject-matter jurisdiction over Count III, and that we continue

---

[4] The provision pertaining to accounts for the expenses concerning presidential nominating conventions does not apply to national congressional campaign committees.  See 52 U.S.C. § 30116(a)(9)(A).

25

to possess jurisdiction as well, we turn to Appellants' contention that the district court erred in granting summary judgment to the FEC on the merits on that claim. We conclude that the district court was correct to grant summary judgment.

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 384–85 (4th Cir. 2012) (internal quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Although the Fourteenth Amendment's Equal Protection Clause does not apply to the federal government, the Fifth Amendment's Due Process Clause contains an equal protection component. See Bolling v. Sharpe, 347 U.S. 497, 499 (1954). Indeed, the Supreme Court has explained that "the equal protection obligations imposed by the Fifth and the Fourteenth Amendments [are] indistinguishable." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 217 (1995).

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from

26

others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id.

Count III alleges that the challenged limits violate the Fifth Amendment's equal protection component by discriminating against MPCs and in favor of political committees that have satisfied the other MPC criteria but have yet to complete the waiting period. The critical case governing this claim is California Medical Ass'n v. FEC, 453 U.S. 182 (1981) ("CMA"). In that case, an unincorporated association of California doctors, along with other plaintiffs, brought a declaratory judgment action challenging the constitutionality of a FECA provision prohibiting individuals and unincorporated associations from contributing more than $5,000 to any MPC in a calendar year. See id. at 185-86. One basis for the challenge was that the provision violated the equal protection component of the Fifth Amendment's Due Process Clause. See id. at 200. The plaintiffs' position was that even though unincorporated associations were similarly situated to corporations and labor unions, the provision treated unincorporated associations more harshly since corporations and labor unions were not subject to

27

a similar limit.[5]  See id.  The district court certified the constitutional questions in the case to the Ninth Circuit, which upheld the provision.  See id. at 186.  The plaintiffs then sought review of that decision in the Supreme Court.  See id. at 186-87.

Like the Ninth Circuit, the Supreme Court concluded that the challenged limit did not violate the Fifth Amendment.  The Court reasoned as follows:

> In order to conclude that [the restriction] . . . violates the equal protection component of the Fifth Amendment, we would have to find that because of this provision [FECA] burdens the First Amendment rights of persons subject to [the challenged restriction] to a greater extent than it burdens the same rights of corporations and unions, and that such differential treatment is not justified.  We need not consider this second question — whether the discrimination alleged by appellants is justified — because we find no such discrimination.  Appellants' claim of unfair treatment ignores the plain fact that the statute as a whole imposes far fewer restrictions on individuals and unincorporated associations than it does on corporations and unions.  Persons subject to the [challenged restriction] may make unlimited expenditures on political speech; corporations and unions, however, may make only the limited

---

[5] FECA allowed corporations and labor unions to pay for the establishment, administration, and solicitation of a "'separate segregated fund to be utilized for political purposes.'" California Med. Ass'n v. FEC, 453 U.S. 182, 200 (1981) (quoting 2 U.S.C. § 441b(b)(2)(C) (now 52 U.S.C. § 30118(b)(2)(C))).  There was no statutory limitation on the amount these groups could spend on such funds.  See id.  And, the plaintiffs claimed that the contributions of a corporation or labor union to its segregated political fund should be considered to be directly analogous to the contributions of an unincorporated association to an MPC.  See id.

28

> contributions authorized by § 441b(b)(2) [now 52
> U.S.C. § 30118(b)(2)]. Furthermore, individuals and
> unincorporated associations may contribute to
> candidates, to candidates' committees, to national
> party committees, and to all other political
> committees while corporations and unions are
> absolutely barred from making any such contributions.
> In addition, [MPCs] are generally unrestricted in the
> manner and scope of their solicitations; the
> segregated funds that unions and corporations may
> establish pursuant to §441b(b)(2)(C) [now 52 U.S.C.
> § 30118(b)(2)(C)] are carefully limited in this
> regard.

Id. at 200-01 (emphasis in original).

The FEC argues that the claims here fail for similar reasons in that political committees overall clearly receive more favorable treatment under FECA than do other groups. For that reason, the FEC argues, there is no discrimination by FECA against MPCs that must be justified. We largely agree with the FEC's position, but with one caveat. We believe the FEC is correct to the extent it argues that CMA requires us, in determining whether actionable discrimination has occurred, to compare the treatment the relevant respective groups receive under FECA overall, not just the treatment the groups receive under the specific provision of FECA that is being challenged. We conclude, however, that the proper comparison is between political committees that have become MPCs and political committees that have not completed the waiting period but have satisfied the other MPC conditions. It is those two groups,

after all, that Appellants maintain are similarly situated yet treated differently under FECA.

Nevertheless, in our estimation, Appellants cannot show that FECA overall burdens the First Amendment rights of political committees that have become MPCs more than it burdens the rights of political committees that have satisfied all MPC requirements but the waiting period. That is so because the decrease in the amount of contributions that political committees, once they become MPCs, can make annually to state party committees or their local affiliates (from $10,000 to $5,000) and to national party committees (from $32,400 to $15,000) is more than counteracted by the increase in the limits in the amount of contributions that MPCs can make to individual candidates (from $2,600 to $5,000). To the extent that there is a difference in treatment, it appears to us to favor the MPCs in that the total amount of money MPCs can contribute overall will be substantially greater since there are so many different individual candidates to which the respective entities can contribute. Because Appellants cannot demonstrate that FECA discriminates against MPCs, there is no discrimination to be justified, and we conclude that the FEC was entitled to summary judgment on Count III.

V.

In sum, we conclude that the district court erred in adjudicating the merits of Counts I and II, as those claims became moot once the political committees challenging them became MPCs and were no longer subject to the limitations they were challenging. Accordingly, we vacate the merits judgment on those claims and remand to the district court with instructions to dismiss them for lack of subject-matter jurisdiction. On the other hand, we conclude the district court properly granted summary judgment to the FEC on Count III, and we therefore affirm the judgment on that claim.

AFFIRMED IN PART;
VACATED AND REMANDED IN PART
WITH INSTRUCTIONS TO DISMISS